# SILVERSON, PARERES & LOMBARDI, LLP
## Attorneys at Law
300 East 42nd Street
New York, New York 10017

Robert M. Silverson, Jr.
Joseph T. Pareres*
Victoria A. Lombardi

Nancy I. Maltin
Rachel H. Poritz
Jeffrey J. Schietzelt
Craig J. Kamback
Rocco R. Riccobono
*Also Admitted in Connecticut

Telephone: (212) 557-1818
Facsimile: (212) 557-1336

www.splllp.com

January 15, 2008

Honorable Gerard E. Lynch
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: United States of America v. Peter Castellaneta
       Index No. 07 CIV 7694

Dear Justice Lynch:

  The undersigned represents Queens Long Island Medical Group, a defendant in the interpleader action (07 CIV 7694) concerning the seized funds of defendant Peter Castellaneta and the claims of Queens Long Island Medical Group to those funds.

  On today's date the undersigned received for the first time a copy of a correspondence sent to Your Honor by Peter E. Brill, Esq., dated December 19, 2007. I received this letter by email and a telephone message was also left by Mr. Brill apologizing for not copying us on this correspondence to Your Honor. Therefore, the undersigned was not aware of Mr. Brill's correspondence to Your Honor. A copy of the email and correspondence are attached hereto.

  With respect to Your Honor's Order dated November 19, 2007, and the issue of the seized funds, please be advised that currently pending in the related state court action (Index No. 111252/07) is defendants Castellaneta and Gatz' joint motion to dismiss the Complaint filed against them in the state court action. Plaintiff has opposed this motion and served an Amended Complaint. The motion is currently returnable on January 24, 2008. A Preliminary Conference has also been scheduled for January 24, 2008.

  Additionally, with respect to the seizure of the funds and the stay of this issue in Federal Court, please be advised that we are in the process of making a motion for summary judgment on the issue of liability against the defendants in state court. In support of this motion, the undersigned obtained from defendant Denise Lamonica (through her attorney, as she is incarcerated in Federal Prison) an affidavit containing various admissions and information that will support our summary judgment motion. A

copy of a letter from Ms. Lamonica's attorney and a copy of Ms. Lamonica's handwritten notes provided to her attorney regarding the liability of defendants is attached hereto. We are in the process of obtaining a typed and signed Affidavit from Ms. Lamonica and her attorney so that we can make this motion before the state court, obtain a judgment, and resolve this matter in an expeditious fashion.

    Therefore, in light of the currently pending motion, the scheduled conference, and the forthcoming motion based upon the Federal Criminal Trial transcripts, the testimony and admissions therein, and the Affidavit of Ms. Lamonica, the undersigned attorney for Queens Long Island Medical Group respectfully requests that This Court grant additional time for the resolution of this issue in state court before lifting the currently imposed stay.

    Thank you for your attention to this matter.

    Respectfully submitted,

Rachel H. Poritz, Esq.
Silverson Pareres & Lombardi
(212) 557-1818

Encl.

CC:    Peter Brill, Esq.
    Karasyk & Moschella, LLP
    (Via email)

    Roger J. Bernstein, Esq.
    Bernstein, Nackman & Feinberg, LLP
    (Via email)

    Seetha Ramachandran, Esq.
    Assistant U.S. Attorney
    (Via email)

## Rachel H. Poritz

| | |
|---|---|
| **From:** | Peter Brill [pbrill@kmattorneys.com] |
| **Sent:** | Friday, January 11, 2008 4:11 PM |
| **To:** | 'Rachel H. Poritz' |
| **Subject:** | RE: US v Castellaneta & QLIMG |
| **Attachments:** | ltjudge.dec19.07.wpd |

The letter I left you a voice mail about. I apologize again.

PETER E. BRILL, ESQ.
Karasyk & Moschella, LLP
225 Broadway, 32nd Floor
New York, New York 10007
(212) 233-3800


**From:** Rachel H. Poritz [mailto:rporitz@splllp.com]
**Sent:** Tuesday, September 25, 2007 5:36 PM
**To:** Peter Brill; 'Ramachandran, Seetha (USANYS)'
**Subject:** US v Castellaneta & QLIMG

Please see attached correspondence.

Rachel



Rachel H. Poritz, Esq.
Silverson Pareres & Lombardi, LLP
300 E. 42nd Street, 5th Floor
New York, NY 10017
P: (212) 557-1613
F: (212) 557-1310
rporitz@spllp.com

1/15/2008

December 19, 2007

Hon. Gerard E. Lynch
United States District Judge
United States Courthouse
500 Pearl Street, Room 910
New York, NY 10007

      Re:    *USA v. Peter Castellaneta and Queens Long Island Medical Group, P.C.*
              *07 Civ. 7694*

Dear Judge Lynch:

      As per the Court's recent decision (November 19, 2007, Document Number 8), the December 10th deadline set by the Court for the filing of state attachment proceedings has passed with no action taken by either party. Under CPLR Section 6223(b), it is the plaintiff's burden to establish "the grounds for the attachment, the need for continuing the levy and the probability that he will succeed on the merits." The plaintiff, QLIMG, has not done so. Petitioner Castellaneta did not make a motion in state court because, as stated, it is the plaintiff's burden to justify a continued attachment. Through its lack of action, QLIMG may in fact be implicitly acknowledging this, as well.

      Since QLIMG has not attempted to meet its burden of justifying a continued *de facto* attachment in the pending state court action, Petitioner Castellaneta respectfully requests that this Court vacate its stay and reopen the question of the appropriateness of this federal interpleader action.

      Thank you for your consideration.

                                  Sincerely yours,

                                  KARASYK & MOSCHELLA, LLP

                                  Peter E. Brill

PEB:ir

# Eric M. Gansberg
Attorney at Law

36 Richmond Terrace, Suite 207
Staten Island, New York 10301
(718) 447-3700
Fax (718) 447-4328
emgansbergesq@aol.com

November 30, 2007

Rachel H. Portiz, Esq.
Silverson, Pareres & Lombardi, LLP
300 East 42nd Street
New York, New York 10017

   **Re: Queens Long Island Medical
   Group, P.C. v. Castellaneta, et al**

Dear Ms. Portiz:

In furtherance of our recent telephone conversation, I requested that Denise LaMonica provide a synopsis of the history leading to her conviction and the above entitled action. I am enclosing herewith a copy of Ms. LaMonica's response to my request. Hopefully it will be helpful in providing background for which the matter may move forward in Ms. LaMonica's best interest. Ms. LaMonica also informs me she has no idea where the $122,000 withdrawn from her account, possibly by the F.B.I. went to. A subpoena may be useful in this regard.

Please feel free to contact me should you have any questions or comments.

            Very Truly Yours,

            Eric M. Gansberg

encl.

(1)

I dont remember the exact dates that Peter and myself decided to open the business. Actually it started with Pete saying that he wanted to come up with a way to make extra money so that we could buy something to "invest in."

As Peter already knew, that the company I worked for hired temporary employees to fill in for employees who were out on vacation. etc, or to fill open positions (professionals, nurses, x-ray tech, etc) And that Queens Long Island Medical Group also used permenant placement agencies to help recruit for these opened positions. He said that we should "get into the business" Pete said it would be easy to make money since I already knew which positions were available. + since there where 22 centers always in need of help we could probably make alot of money.

Peter made an appointment with an attorney that he knew, who helped him with his purchase of his home. Her name was Sandra Sindel (check spelling). Peter myself + Curtis, because Pete decided that Curtis should be a partner, went to see Sandra. She asked if I ever signed a contract with QLIMG, + wanted to know if there was any rules, or policies, regarding me working or doing business with any other company while employed with QLIMG. I told her that no contract was ever signed + I was the person who wrote the Human Resources Policy + Procedure manuel and was unaware of any such policies.

Sandra did all the necessary paperwork to make a corporation, under the name Traditional Persona DBA as Stafford Personal. (might be the opposite, way around with the name I dont remember)

My impression from Sandra, was that she didnt agree with us starting this corporation. That it might be bordering on some kind of "conflict of interest" but thus is what Pete wanted + the corporation was established. I think that was in October, although I cant remember

Since Pete owned his own business. It was established with Sandra that Pete or Curtis would be the President or Vice President & that I would remain silent. Like a silent partner. So that I wouldn't cross that gray area of the "conflict of interest issue."

Curtis was made the President & originally set up a bank account @ Roslyn Savings bank on Avenue U in Bklyn. Pete was the vice president. But both were signers on the checking & savings account.

To generate money into these accounts. Our first transaction was to fill an open position at one of the Long Island Locations with either an RN, LPN or X-Ray tech I cant remember exactly which professional it was.

I believe the 1st person billed to QLIMG was Robert Smith an RN who worked @ the Woodbury Center in LI. We charged 20% of his annual salary. The invoice was made using Quickbooks originally. The program, I bought & was loaded into Curtis's computer which was in the basement of his home. I made an invoice for Stafford & a custom invoice for Traditional. I did not mail the invoice. I brought it to work & put it in a "to be signed pile." The pile was for my boss the CEO Mike Sparacino to sign & then his secretary Ellen Kumpf would send it to accounting to have a checked processed.

When the check was mailed it was mailed to a P.O Box that was @ a rent a box in Manhatten that Curtis had set up.

The 1st check was for about $7,000, or so. This check was entered in for payment by Curtis, on the Quick books program.

We used the money to pay for the corporation fees, the Quick books programs, & all the "business start up fees"

This process continued, I would meet Curtis about once a week @ his house. make invoices, and bring them to

(3)

work, sign them, and "put them in the to be signed pile" for Mike Sparacino to sign & then sent to accounting for processing.

Each invoice was averaging around $7,000 dollars.

Peter, myself & Curtis, went to see an accountant named Joe, who was a friend of Curtis's girlfriend Linda. We meet with him so that he could handle our taxes, payroll, sales, etc for the business. Upon our initial meeting Peter didn't like Joe, because he wanted to download our tax info from the Quick books program on-line. Pete thought that was dumb & he decided that Joe wouldn't be our accountant. Pete made us use the accountant that he used for his business Neil Sontag.

Neil would come to Curtis's house once a month. We would decide how much money we wanted to take as a paycheck each & Neil would figure out how much taxes, to take out so that we would have the exact amount that we originally requested. In addition, Neil would allow us to write checks for our expenses " gas, tolls, any thing we needed for the business.

All 3 of us would take the same amounts to be fair, even if we didn't have any receipts to support the expenses.

Eventually Pete instructed Curtis to change banks from Roslyn to Chase, since Pete banked @ Chase & said it was a commercial bank. At that point we had 2 bank accounts opened 1 @ Rosyln & one @ Chase, so monies were withdrawn from Rosyln until it was depleted & then we only used the Chase accounts. I still was not a signer on any of the accounts.

I just got a check, made out to me monthly for payroll & a check for my expenses they were always signed by Curtis or Pete.

Neil suggested that we buy cars, because he didn't want us to have a profit at the

end of the year. We all took $7,000 out of the account. I bought a Mercedes, Curtis & Pete bought Explorers, and Curtis & I paid our monthly car payment + insurance through the business.

At the end of the year we recieved W2's + what ever taxes we owed Neil allowed us to pay them with a check from the company

At one point Queens Long Island Medical Group stopped using agencies for recruitment + temporary staffing. When I told Pete, he said that he hoped I didn't make him "set up this corp for nothing". I felt pressured to make money + started to submit false invoices for people who did not work.

Pete was very happy that the money continued to come in. He copied his software program from his personal business + insisted that we use it instead of Quick books.

I created new invoices, and continued to send them out.

We continued to write off all our expenses + continued to have Neil come once a month to cut paychecks for us.

Curtis would continue to enter in all the checks as paid in the computer when he would pick them up @ the P.O. Box.

The money was used to pay for vacations, skiing, we would write on the checks that they were conferences.

Money was used to pay the contractors that were working on Pete's house to build a sun room, that was written as office space to be build in Pete's house. When Pete's house was bricked money was taken from the corp to pay for materials + labor. Neil would say that this money was a loan that Pete borrowed from the corp.

⑤

Most of the times, Pete would make Curtis write a check to me, & then I would deposit it into my personal account & then I would write the check to the contractors, etc.

Although if you check the bank records for the corp. alot of times the checks were written directly to the contractors.

Pete insisted that Worker's comp insurance was set up for the corp. And made me open an email account & I even set up a Monster.com account to look for resume's if needed.

These accounts were set up to make it look good.

Pete wanted me to send out letters to other companies to see if they wanted to use our services. Although Pete only wanted to deal with QLIMG. The letters were also sent to other companies to make it look like we were doing business with others although our only "client" was QLIMG.

Pete decided to make our so called company competitive, he told me to lower our price. The price we were charging QLIMG for temp & perm workers.

The perm workers fee was usually 20% of their annual salary. I believe that we lowered it to 15 - or even 10% of their annual salary, & the temp workers went from $38-40 an hour down to $35 or $32.50 per hour.

This insured that the invoices would still be paid because our rates were lower then any other agency.

Around May of 2005 QLIMG hired another management company to run the company they bought in all their own staff & eventually I was laid off. I recieved a severance package & continued my health insurance for 60 days.

While I wasn't working I still continued

to take paychecks from Traditional Stafford, but put it on expenses, cause I also was collecting unemployment benefits.

Pete audited the open invoices that QLIMG still owed. I believe it totalled about $78,000.

He made Curtis call QLIMG everyday to get the money they owed us. Since he needed the money to finish with the renuvations on his house.

He made me send the invoices owed return, receipt by mail.

He wanted the money owed.

Around this time our accountant Neil died.

We continued to take money, but we never paid any taxes on the money.

I never knew what was the ending balance in the check books, when we got arrested, because I never saw them since Curtis & Pete were the only signers & they were left @ Curtis's house.

When we got arrested. Pete waived his rights & told the FBI information, that I never found out what it was.

He didn't like the idea that I had a public defender & always tried to make me get a new lawyer.

He made me write letters, to the judge & the Prosecutor, saying that he & Curtis never did anything & that I did everything & never told him anything.

He taped recorded several conversations without me knowing & also had his mother tape a conversation @ my parents new house without any of our consent.

He made me re-create the invoices so he could give them to his attorney. He made me give him all my medical records, that his attorney couldn't obtain.

(7)

He took checks (cancelled) from my personal records, and closed a bank account that we had opened jointly. Although it was linked to my personal savings + checking account.

He threatened to throw me out of "his house" on numerous occasions, if I didn't call his attorney or have my attorney set up meetings so that I could tell the DA that he had nothing to do with this crime. And that I never told him what I was doing.

When he finally made me leave his home + I moved back to my parents home. He + I were still in contact. Some days I would go over to the house + things would be good. Although he always wanted to talk about the case.

He still has my laptop computer, with all the letters I wrote to my judge + attorney. He has all the files + invoices.

Peter has made several threats, regarding my family + suing me for everything including pain + suffering, since he has gone through this in just arrest + lawyers fees.

Since pleading guilty. He thought I would testify @ his trial as to my guilt + his innocence. That he had nothing to do with all of this.

He has sent me numerous text messages, threatening me.

I have not had any contact with him in the last few months.

The last time I heard from him was when I got an email telling me that he got civil suit paperwork @ his house for me.

He wanted to know where he could send or drop of the paperwork since I was in prison.